STATE OF HAWAII, Plaintiff-Appellant, *v.* JOHN LUTHER SCHOFILL, also known as "TINY," Defendant-Appellee

NO. 6967

DECEMBER 29, 1980

RICHARDSON, C.J., OGATA, MENOR AND CIRCUIT JUDGE LUM, ASSIGNED BY REASON OF VACANCY*

---

\* Justice Kobayashi, who heard oral argument in this case, retired from the court on December 29, 1978. HRS § 602-10 (1979 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

OPINION OF THE COURT BY MENOR, J.

The defendant was indicted for the offense of promoting a dangerous drug in the first degree. He was alleged to have knowingly distributed drugs in violation of the provisions of HRS § 712-1241(1)(b) (1976 & Supp. 1979).

The trial court dismissed the indictment on the grounds (1) that incompetent and prejudicial evidence was presented by the State to the grand jury, and (2) that the offense charged and the circumstances surrounding the alleged offense constituted a de minimis infraction as defined by HRS § 702-236(1)(b) and (c) (1976). The State appeals. We reverse.

I.

Officer James Quinn, an undercover officer employed by the Maui Police Department at the time of the alleged commission of the offense, was the only witness presented by the State before the grand jury. He testified that he first came into contact with the defendant, who was also known as "Tiny," at the Aquarian Age T-Shirt Factory which was owned by the defendant. At this initial meeting, he asked the defendant if he would sell him a quarter ounce of cocaine. After satisfying himself that Quinn was not a police officer, the defendant told Quinn that if he could furnish him with a satisfactory reference the defendant might be able to do business with him later.

A few days later, on October 4, 1977, one Joseph Thornton approached the officer in Lahaina and asked him if he was interested in purchasing a quarter gram of cocaine. Quinn said he was interested. For the next few days he maintained contact with Thornton and on several occasions during that period he observed and heard Thornton telephone and ask to speak to an individual named "Tiny." Quinn noted and memorized the telephone number dialed by Thornton and later verified it to be the number of the defendant's establishment.

Thornton finally advised Quinn that the deal had been worked out with "Tiny" and would be consummated on the following Friday. Thornton, however, did not show up at the appointed time. The following Tuesday, October 11, Quinn decided to call "Tiny" himself and when the defendant answered, the officer told him that

inasmuch as Thornton had failed to show up on Friday, he would like to deal with "Tiny" directly. The defendant assured Officer Quinn that the Friday deal had been a "sure thing" and that if Quinn would give him a call in a few days, he would see if he had anything available for sale at that time.

Pursuant to the defendant's suggestion, Officer Quinn called again on October 13. At that time the defendant told him that he would have a quarter ounce of cocaine available the following Friday and asked the officer to phone him on that day. When the officer called as directed, the defendant told him that the price for the cocaine would be $550.00. Quinn asked if the transaction could be consummated on Saturday if he could not obtain the money by Friday. The defendant answered that it would be all right but that Quinn should be sure to call in the event he could not raise the money by Friday. Officer Quinn called on Friday afternoon as directed. At that time the defendant told him that he had talked to Thornton about the transaction and wanted Quinn to get in touch with Thornton that evening. The officer called Thornton as instructed, and Thornton told him to pick him up at Lahaina the next day, Saturday, October 15, at 10:00 a.m.

The next morning Officer Quinn met with Thonton and they proceeded directly to the defendant's business establishment. Thornton told him to wait in the car, while he himself went into the factory. A couple of minutes later Thornton returned with a small vial containing a white, powdery substance. Attached to the cap of the vial was a little spoon, which the officer recognized as one ordinarily used for "snorting" cocaine. Thornton tested the substance and told Quinn that it was "right on coke." He then asked Quinn for the money. The officer gave him $550.00 and Thornton went back into the factory with the money. When he returned to the waiting officer, Thornton told him that "Tiny" would have to go somewhere to get the cocaine and that they should return at 1:00 p.m.

At the appointed time they returned to the defendant's business establishment but "Tiny" was not there, so they drove around for awhile. When they went back, the defendant apparently had returned, so Thornton went in and several minutes later returned to Quinn with four clear plastic packets containing a white, powdery substance. Thornton informed Quinn that "Tiny" did not have all of

the seven grams necessary to make up the quarter ounce Quinn wanted to buy and that Quinn had the option of taking the four packets and coming back later that evening for the other three, or he could have his money back. Quinn had wanted to conclude the deal at that time so he asked for his money back. No actual purchase was ever consummated with the defendant.

The evidence presented to the grand jury which the trial court found to be incompetent and prejudicial and upon which it essentially predicated its dismissal of the indictment was the following testimony of Officer Quinn:

Q. When Thornton brought out these four packets of white, powdery substance, did you examine them?

A. Yes, I did.

Q. And what did they look like to you?

A. They appeared to be cocaine from past experiences where I've purchased cocaine and it has been tested in a laboratory with positive results. It looked similar to that substance.

Q. In addition to this working knowledge of the drug, have you also received training in the identification?

A. Several college courses dealt with drugs and cocaine.

[THE PROSECUTOR]: Are there any questions?

[GRAND JURY FOREMAN]: Those four packets were tested, did you say?

A. No, sir, they were returned.

The fact that the substance was never subjected to laboratory analysis appeared to have been very much on the court's mind when it made inquiry of the prosecutor at the hearing on the motion to dismiss the indictment:

THE COURT: Mr. Takayesu, did you present the case before the Grand Jury?

MR. TAKAYESU: I did.

THE COURT: Let me ask you, at the trial, how can you prove that was cocaine? If it went to trial, how are you going to prove that it was — a defendant was handed a bottle of what you allege to be cocaine to a co-worker to take out.

Where possession of narcotics is the gist of the offense charged, the government must establish beyond a reasonable doubt that the substance involved is that specified in the indictment. *State v. Lloyd,* 61 Haw. 511, 521, 606 P.2d 913, 920 (1980). The same rule obtains

where the sale has been consummated. *People v. Vandiver*, 191 Colo. 263, 266, 552 P.2d 6, 8 (1976). The defendant, however, was indicted for knowingly distributing proscribed drugs under HRS § 712-1241 (1976 & Supp. 1979) which, in pertinent part, provides:

Section 712-1241 *Promoting a dangerous drug in the first degree.* (1) A person commits the offense of promoting a dangerous drug in the first degree if he knowingly:

\* \* \* \*

(b) *Distributes:*

\* \* \* \*

(ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of
(a) One-eighth ounce or more, containing any of the respective alkaloids or salts of . . . cocaine . . . (Emphasis added).

A person "distributes" a dangerous drug when he sells, transfers, gives, or delivers to another, or leaves, barters, or exchanges with another, *or offers or agrees to do the same.* HRS § 712-1240(11) (1976 & Supp. 1979). Thus, the crime of promoting a dangerous drug by distributing the same is complete where, with the specific intent to sell, the accused has offered to sell the contraband. *People v. Jackson*, 59 Cal.2d 468, 30 Cal. Rptr. 329, 381 P.2d 1 (1963); *People v. Brown*, 55 Cal.2d 64, 9 Cal. Rptr. 816, 357 P.2d 1072 (1960); *cert. denied*, 366 U.S. 970 (1961); *People v. Allen*, 254 Cal. App.2d 597, 62 Cal. Rptr. 235 (1967); *People v. Monteverde*, 236 Cal. App.2d 630, 46 Cal. Rptr. 206 (1965); *People v. Shepherd*, 223 Cal. App.2d 166, 35 Cal. Rptr. 497 (1964). Actual delivery in such case would not be required. *Id.*, *Porter v. Sheriff, Clark County*, 87 Nev. 274, 485 P.2d 676 (1971), and neither, obviously, would a chemical analysis of the substance. *Cf. People v. Brown, supra; People v. Shepherd, supra.* Thus, the trial court erred when it presumed that the white, powdery substance which the defendant offered to sell through his intermediary must have been shown beyond a reasonable doubt to be cocaine before a conviction could be obtained.

In *People v. Brown, supra,* defendant was charged with offering to sell narcotics to an undercover police agent. The officer had arranged to buy heroin from an unidentified person and was awaiting delivery when the defendant approached him. In the course of the

conversation that ensued, the officer mentioned that he was await-
ing delivery of heroin. The defendant then left. The following
afternoon the officer, while sitting in a bar, again saw the defendant.
This time the officer asked if the defendant could get him some
heroin. The defendant answered that he could get it for him and
wanted $9.00 for it. The officer gave him the money and the defen-
dant left. The officer waited for some time but the defendant did not
return. He saw the defendant again several days later and asked him
why he had not returned to the bar. The defendant explained that
he had obtained the drug but that he had to get rid of it because the
police had "rousted" him. The officer again encountered the defen-
dant about a week and a half later and told him "[t]hat was a pretty
dirty deal you pulled on me the other day." The defendant replied
that he would speak to him later. The officer, however, did not see
the defendant again until his arrest. On these facts, the trial court
found the defendant guilty under a statute which provided, in
pertinent part, that "every person who . . . offers to . . . sell, furnish,
administer, or give away, . . . any narcotic other than marijuana . . .
shall be punished." The California supreme court affirmed the
conviction.

In *People v. Shepherd, supra,* the charge against the defendant was
that he "did wilfully, unlawfully and feloniously offer to sell, furnish
and give away a narcotic, to wit, marijuana." The facts upon which
his conviction was based were essentially as follows: One Officer
Johnson, a police undercover agent was standing in front of a
doughnut shop when he was approached by a man named "Al."
After a conversation with the officer, "Al" walked over to the defen-
dant and spoke to him. Shortly thereafter both men returned to the
officer. The defendant asked him what he wanted and the officer
replied, "Can you get me half a can?" The defendant said he would
have to make a phone call and walked away. He returned shortly and
told the officer they would have to go to a certain location to obtain it,
since his supplier "only has cans and he don't want to break them
down." When they arrived at that location, the defendant told the
officer to wait and asked him for the money. He said he would walk
around the corner, get a can of "weed" and bring it back. The officer
gave the defendant $15.00. The defendant then got out of the car
and walked around the corner. The officer waited as directed but he
did not see the defendant return. Ten days later the officer again

saw the defendant and asked him, "What happend to my money? Why didn't you bring my money back or the narcotics?" The defendant replied that he had been picked up by the police and had to spend the money to get out on bail. He then said, "I will get your narcotics for you." The sale was never consummated, but on these facts the California appellate court sustained his conviction.

We emphasize, however, that where the gist of the charge is the offer or the agreement to sell narcotics, the intent to sell must be established beyond a reasonable doubt. This would necessarily require proof of the defendant's intention to perform. "Persons who offer to sell narcotics with no intention of performing are not engaged in narcotics traffic. Their behavior is not materially different from that of other 'bunco' offenders and is not subject to the severe penalties imposed by [the statute]." *People v. Jackson, supra,* at 469-70, 30 Cal. Rptr. at 330, 381 P.2d at 2. In the instant case the officer's testimony regarding the white, powdery substance which the defendant offered to sell through his intermediary was therefore relevant and competent upon the issue of intent to sell and was probative of his intention to perform. The substance was represented to him as cocaine, and because of his training and experience the officer was able to testify that it appeared to him to be cocaine. His background concerning narcotics identification might have been more fully developed by the prosecution. However, evidence before the grand jury, where the standard is essentially that of probable cause, need not be as detailed as at trial. Moreover, the officer's expertise need not be such as to qualify him to render an opinion that the substance was in fact cocaine. Officer Quinn testified that he had taken several courses dealing with drugs and cocaine; that he had purchased cocaine before which was subsequently subjected to laboratory tests with positive results; and that he was familiar with the appearance of cocaine. On the basis of this background concerning the drug, we find that he was qualified to state that the substance "appeared to be cocaine."

The essential question before the grand jury was whether the defendant intended to sell the proscribed drug to the undercover police officer. *People v. Jackson, supra.* Considering the history of the negotiations between the officer and the defendant or his intermediary, the representation that the narcotic offered to be sold was cocaine, and the officer's familiarity with the substance, we find that

there was ample evidence presented to the grand jury from which a trial jury could have found the defendant guilty of offering to sell narcotics beyond a reasonable doubt. The challenged testimony was neither incompetent nor prejudicial, and the trial court ought not to have dismissed the indictment on that particular ground.

## II.

Neither should the trial court have dismissed the indictment on the ground that the offense charged and the circumstances surrounding the alleged offense constituted a de minimis infraction as defined by HRS § 702-236(1)(b) and (c) (1976). Those provisions provide:

(1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

(a) Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or

(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction.

Promoting a dangerous drug in the first degree under HRS § 712-1241 (1976 & Supp. 1979) is a Class A felony, punishable by imprisonment for a period of 20 years. Traffic in narcotics can hardly be said to be a de minimis offense. *See State v. Caldeira, Jr.,* 61 Haw. 285, 602 P.2d 930 (1979).

Reversed and remanded.

*James B. Takayesu,* Deputy Prosecuting Attorney, for plaintiff-appellant.

*Richard L. Rost, (Padgett & Rost,* of counsel) for defendant-appellee.