881 P.2d 1218

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Isaiah D. REED, Defendant–Appellant.**

**No. 16178.**

Supreme Court of Hawai'i.

Sept. 29, 1994.

André S. Wooten, on the briefs, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Pros. Atty., on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., KLEIN, NAKAYAMA and RAMIL, JJ., and BURNS, Intermediate Court of Appeals Chief Judge, in place of Levinson, J., recused.

NAKAYAMA, Justice.

On January 11, 1990, plaintiff-appellee State of Hawai'i (the prosecution) filed a complaint in the Circuit Court of the First Circuit, State of Hawai'i, charging defendant-appellant Isaiah Reed with two counts of promoting a dangerous drug in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1242(1)(c) (Supp.1992) [1] (counts 4 and 5); one count of promoting a dangerous drug in the first degree, in violation of HRS § 712–1241(1)(b)(ii)(A) (Supp. 1992) [2] (count 6); and two counts of promoting a dangerous drug in the third degree, in violation of HRS § 1243 (1985) [3] (counts 7 and 8). The charges stemmed from several drug deals that Reed made with an undercover officer of the Honolulu Police Department in December 1989. At trial, Reed's main defense was entrapment. On March

---

**1.** HRS § 712–1242(1)(c) (Supp.1992) provides that "(1) [a] person commits the offense of promoting a dangerous drug in the second degree if the person knowingly ... (c) [d]istributes any dangerous drug in any amount." Promoting a dangerous drug in the second degree is a class B felony. HRS § 712–1241(2) (1985 & Supp. 1992).

**2.** HRS § 712–1241(1)(b)(ii)(A) (Supp.1992) provides that "(1) [a] person commits the offense of promoting a dangerous drug in the first degree if the person knowingly ... (b) [d]istributes ... (ii) [o]ne or more preparations, compounds, mixtures, or substances of an aggregate weight of:

(A) [o]ne-eighth ounce or more, containing ... cocaine or any of [its] ... salts, isomers, and salts of isomers[.]" Promoting a dangerous drug in the first degree is a class A felony. HRS § 712–1241(2) (1985 & Supp.1992).

**3.** HRS § 712–1243(1) (1985) provides that "[a] person commits the offense of promoting a dangerous drug in the third degree if [the person] knowingly possesses any dangerous drug in any amount[.]" Promoting a dangerous drug in the third degree is a class C felony. HRS § 712–1243(2) (1985).

12, 1992, a jury convicted Reed of all counts. On appeal, Reed claims that the trial court committed reversible error by: (1) denying his motion for a bill of particulars requiring the prosecution to detail the charges against him; (2) erroneously instructing the jury on the burden of proof on his entrapment defense; (3) denying his motion for judgment of acquittal, in which he essentially argued that he had established entrapment as a matter of law; and (4) denying his motion for new trial, in which he claimed that his trial counsel rendered constitutionally ineffective assistance. Reed also argues that the evidence was insufficient to support the jury's verdict finding him guilty of count 6, promoting a dangerous drug in the first degree, and that his constitutional right to equal protection of law was violated because he was the victim of a discriminatory prosecution. For the following reasons, we affirm Reed's conviction on all counts.

## I. BACKGROUND

Reed's jury trial commenced on March 4, 1992. The prosecution's primary witness was Honolulu undercover police officer William Wardell. Wardell testified to the following. On December 18, 1989, he met Reed at a hotel in Waikiki to discuss a drug deal. After some initial discussion, the two left together for another hotel in Waikiki. When they arrived at the second hotel, the two firmed up the details of the deal in the parking lot. Wardell agreed to pay $150 in exchange for one-sixteenth of an ounce of cocaine. Wardell testified that he gave Reed the money and that Reed then went into the hotel. Wardell waited in the parking lot. When Reed returned, he gave Wardell a plastic "zip-lock" bag containing a white powder.[4] Wardell testified that Reed then asked him for some of the drug in the bag. Wardell refused, instead giving Reed $15 "as a tip for his service." On their way back to the first hotel, the two discussed doing other drug deals, and Wardell gave Reed his "beeper" number as a means of contacting him in the future.

Wardell testified that Reed paged him on December 22, 1989 and that he answered the page by phoning Reed. During their telephone conversation, Reed asked Wardell if he wanted to purchase more drugs. Wardell responded that he did not want to buy anything "at that time, [but] that I would get in touch with him after Christmas."

According to Wardell, the next time the two talked was on December 26, 1989, when he telephoned Reed, offering to purchase one-quarter of an ounce of cocaine for $550. Wardell called Reed about purchasing the quarter ounce again the following day. Reed told Wardell to go to a certain hotel in Waikiki and call him from a pay phone when he arrived. Wardell followed Reed's instructions and was met at the phone by Reed's girlfriend, Sheila Williams, and Paul Peralta, who told Wardell that he worked for Reed. Wardell followed the two to the eighth floor laundry room of the hotel. Wardell testified that when they got there Peralta told him that he and Reed felt that a one-quarter ounce deal was "a bit too large," because it carried a "class A" felony penalty if they got caught. He therefore suggested doing a deal "at a smaller level," one-sixteenth of an ounce. Wardell agreed and gave Peralta $150. Wardell waited with Williams at the hotel while Peralta left to go with Reed to obtain the cocaine at another location.

Peralta returned some time later, but without the cocaine. According to Wardell, Peralta explained that he and Reed had come back to the laundry room while Wardell was away making a phone call and, not finding him there, Reed left. Williams subsequently left the laundry room, where Wardell and Peralta continued to wait for Reed to return. Reed did not show, and Peralta eventually agreed to take Wardell to a nearby hotel where he believed they would find Reed and Williams. They found Reed and Williams there, according to Wardell. All four then returned to the first hotel. Upon returning, Reed produced a plastic bag containing several paper "bindles," one of which he gave to Wardell. The bindle contained a white pow-

---

4. An expert witness for the prosecution testified that the white powder weighed 0.644 grams and tested positive for cocaine.

der.[5]  Wardell subsequently left the hotel, telling Reed that he "would contact him later to finish or conduct other transactions." Wardell testified that before he left, he tipped Reed $20.

Later that same day Wardell called Reed again.  After they discussed another drug deal, Wardell left to meet Reed at the same hotel.  This time Wardell was accompanied by eight back-up police officers, who were apparently out of sight.

Reed met Wardell at the pay phone he had used earlier in the day and brought him up to a room on the thirteenth floor of the hotel. Peralta, Williams and an unidentified woman were in the room when they arrived.  Reed and Wardell went into the bathroom, where they discussed the specifics of their deal. According to Wardell, he offered to buy four grams of cocaine for $100 per gram, and Reed agreed by accepting $400.  Wardell testified that Reed told him that he had only one gram of the drug in his immediate possession and would have to leave the hotel to get the other three.  According to Wardell, before Reed left, he gave Wardell one gram of white powder in a paper bindle.

Wardell testified that Reed returned about an hour later with the other three grams. He told Wardell, however, that before turning over the rest of the cocaine, he wanted Wardell to take the gram he had previously given him down to his truck.  He explained, as Peralta had earlier that day, that by dividing the transaction into smaller amounts, they would face only "misdemeanor" charges if they got caught.  Wardell agreed to that procedure and went to his truck, accompanied by Reed, to deposit the paper bindle containing the one gram.  Unbeknownst to Reed, however, Wardell slipped the bindle into his shoe and returned to the hotel room with Reed.

Back at the room, Wardell testified that he convinced Reed to split the remaining three grams into two one and one-half gram portions, rather than three one gram amounts, as Reed had initially suggested.  Reed agreed.  The two men weighed out a gram and a half of white powder.  Wardell testified that, while doing so, Reed showed him a paper bindle containing what Reed described as his own "personal stash" of heroin.  After turning over the one and a half gram portion of white powder to Wardell in a paper bindle, Reed returned with Wardell to the latter's truck, where Wardell again slipped the bindle into his shoe.  According to Wardell, they went back to the hotel room, and Reed delivered the remaining one and a half gram portion.[6]

After receiving the last bindle from Reed, Wardell, under the pretense of calling his girlfriend, telephoned his backup unit, signaling that the transaction had been completed. The officers arrived within minutes and placed Reed under arrest.  Peralta and Williams, both of whom had left the hotel room earlier, were apprehended in the parking lot of the hotel.[7]

In addition to the three paper bindles that Reed had given to Wardell, the officers seized two plastic bags from which Reed had taken the powder that he had given to Wardell.  Later, during a routine inventory/weapons search while Reed was being booked at the police station, police recovered the paper bindle that Reed had told Wardell contained heroin.[8]

Reed testified on his own behalf.  Although he did not dispute that he provided some cocaine to Wardell, his version of the

5.  The prosecution's expert testified that the white powder weighed 0.576 grams and contained cocaine.

6.  The prosecution's expert testified that the white powder in the three bindles weighed 4.105 grams in the aggregate and that each bindle contained cocaine.

7.  Peralta was charged with promoting a dangerous drug in the second and third degrees and unlawful use of drug paraphernalia, in violation of HRS § 329–43.5(a) (Supp.1992).  He pleaded

guilty to those charges and his motion for deferred acceptance of guilty plea was subsequently granted.  Williams was charged with promotion of a dangerous drug in the second degree.  She pleaded guilty to that charge.

8.  The prosecution's expert testified that the white powder in the two plastic bags weighed an aggregate of 0.425 grams and contained cocaine and that the substance in the paper bindle weighed 0.259 grams and contained heroin.

incident conflicted sharply with Wardell's account. The thrust of his testimony was that he entered into the drug transactions only because Wardell pressured him into doing so by playing on his vulnerabilities and using other unfair methods of inducement.

He testified, for instance, that during their first meeting on December 18, 1989, he told Wardell that he was "in a spot," having no place to live and not enough money to buy food. He testified that he agreed to provide cocaine to Wardell only after Wardell, in return for the "favor," offered to help him and Williams find a place to live. He also said that he overcame his initial reluctance to help Wardell obtain cocaine, in part because Wardell appealed to a common bond: Wardell, Reed claimed, said he needed the cocaine for his drug-addicted girlfriend, and Reed understood Wardell's situation because his girlfriend, Williams, also had a drug habit.

Reed testified that he was also reluctant to provide Wardell with cocaine the second time they met, on the afternoon of December 27, 1989. This time, he said, Williams unexpectedly brought Wardell to him while he was at an apartment of a friend. He testified that Williams told him that Wardell "wouldn't leave her alone and that he had her in the laundry mat [sic] for three hours and persisted that he wanted some cocaine[.]" Wardell was also upset, Reed testified, because Peralta had taken $150 dollars, but had not supplied the cocaine he had promised in return. In order to appease Wardell and help his girlfriend "get out of this jam," Reed testified that he gave Wardell some cocaine that he had in his possession. He also testified that he offered to give Wardell $20 because the cocaine he gave him was "garbage," *i.e.,* heavily "cut" or diluted with a non-narcotic filler.

Reed testified that when he saw Wardell again later that evening, he was especially susceptible to being induced into doing a drug deal that he really did not want to do, because he was depressed and high on drugs. Nevertheless, after taking $400 from Wardell, he claimed that he resolved not to give Wardell any cocaine, but instead to keep the

money "to teach them a lesson they will never forget[.]" He changed his mind, he said, mainly because Wardell was so persistent, and because Wardell told him that he needed the cocaine for his girlfriend, who he said was "jonesing," *i.e.,* suffering from drug withdrawal.[9] Although Reed admitted giving Wardell some heavily-cut cocaine, his testimony about how much he gave was sketchy. He claimed, however, that it was less than the amount Wardell wanted, because, as he said he told Wardell that night, he normally did not "handle" deals that large: "I'm a misdemeanor sort of guy.... I'm a small fry." He also denied that he told Wardell that he wanted to conduct the transaction in relatively small amounts, but admitted to accompanying Wardell to his truck on one occasion.

On rebuttal, Wardell disputed much of Reed's testimony. Essentially reiterating his testimony on direct examination that he did not use improper tactics to induce Reed into selling him cocaine, he specifically denied, *inter alia:* (1) telling Reed that his girlfriend was addicted to cocaine or that she was "jonesing"; (2) offering to help Reed find a place to stay; or (3) that Reed ever told him that, because his girlfriend (Williams) was addicted to drugs, he could empathize with Wardell's need to get cocaine for his drug-addicted girlfriend.

The case was submitted to the jury on March 11, 1992. On March 12, 1992, the jury returned verdicts of guilty as charged on all counts. Reed filed a motion for judgment of acquittal on May 14, 1992, essentially arguing that the jury's conclusion that he had failed to prove entrapment was unsupported by the evidence. On May 15, 1992, Reed filed a motion for a new trial, primarily arguing that his trial attorney provided ineffective assistance. The trial court held a consolidated hearing on the motions on May 19, 1992. At the conclusion of the hearing, the court denied both motions. Reed was then sentenced to concurrent terms of imprisonment of ten years on counts 4 and 5, twenty years on count 6, and five years on counts 7 and 8. Reed filed a timely notice of appeal from the

**9.** Peralta also testified that Wardell claimed he needed the cocaine for his "jonesing" girlfriend.

judgment of conviction entered on May 19, 1992.

## II. *DISCUSSION*

### A. *Bill of Particulars*

Reed initially argues that the trial court abused its discretion by denying his motion for a bill of particulars, filed on April 18, 1990. He claims that he was entitled to a bill of particulars because the complaint filed against him failed to provide adequate notice of the specific criminal acts with which he was charged. He also claims that the denial was "improper" because it effectively prevented him from raising the "procuring agent defense." We reject both of Reed's arguments and hold that the trial court did not abuse its discretion in denying his motion.

■ Pursuant to Hawai'i Rules of Penal Procedure (HRPP) 7(g) (1988), it is within the trial court's discretion to direct the prosecution to file a bill of particulars informing the defendant of the specifics of the charges he must defend against at trial. *See also State v. Kim*, 71 Haw. 134, 139, 785 P.2d 941, 943 (1990); HRS § 806–47 (1985). The court's discretion should be exercised in light of the purposes of a bill of particulars, which is designed "to enable the defendant to prepare for trial and prevent surprise[.]" *State v. Harper*, 1 Haw.App. 481, 486, 620 P.2d 1087, 1091 (1980); *see also* 1 C. Wright, *Federal Practice and Procedure: Criminal* § 129, at 435–36 (2d ed. 1982) (hereinafter *Federal Practice and Procedure* ) ("[a] good many cases also mention an additional function of permitting the defendant to plead double jeopardy in the event of a subsequent prosecution of the same offense, but it may be doubted whether this really adds anything to the functions" of assisting trial preparation and avoiding prejudicial surprise).

In conclusory fashion, Reed asserts that in denying his motion the trial court disregarded those purposes to his substantial detriment. Specifically, he argues that the complaint's failure to allege the precise manner by which he "distributed" cocaine to Wardell required him to "resort to conjecture as to what specific criminal act(s) [were] alleged" and when they occurred. He claims that "[s]uch lack of specificity prejudice[d him] in the preparation for trial and denie[d him] the effective assistance of counsel" and exposed him to "possible double jeopardy and multiple prosecutions."

Those arguments fall flat in light of the fact that before trial Reed received: (1) the complaint, which set forth the dates on which Reed allegedly distributed cocaine to Wardell; (2) the transcript of the preliminary hearing, at which Wardell testified and was cross-examined by Reed's attorney; and (3) the police reports in discovery. On appeal, Reed does not dispute that those items provided him with the information that he claimed was lacking in the complaint.

■ The trial court was aware that the information had been provided to Reed and concluded that it gave him sufficient notice of the charges against him to enable him to prepare for trial and avoid prejudicial surprise. On that basis, it denied his motion. We hold that such a decision did not constitute an abuse of the trial court's discretion. *See Federal Practice and Procedure* § 129, at 437 (bill of particulars is not required if the information called for has been provided "in some other satisfactory form").

In so holding, we reject Reed's argument that the denial of his motion unfairly precluded him from asserting the procuring agent defense, which essentially provides that one who buys a dangerous drug as an agent for another does not commit the offense of *selling* the drug. *See State v. Erickson*, 60 Haw. 8, 10, 586 P.2d 1022, 1024 (1978) (per curiam). The gist of Reed's argument is that counts 4, 5 and 6 of the complaint charged him with knowingly "distributing" a dangerous drug, without identifying whether the specific means of distribution involved a "sale," as opposed to other methods of distribution.[10] This court has held that the procuring agent defense is unavailable in such circumstances. *Kim*, 71 Haw. at 138–39, 785 P.2d at 943; *State v. Kelsey*, 58 Haw. 234, 566 P.2d 1370 (1977). We have also held, however, that the

10. HRS § 1240 (1985) defines "to distribute" to mean "to sell, transfer, prescribe, give, or deliver to another, or to leave, barter, or exchange with another, or to offer or agree to do the same."

defense becomes available if the prosecution furnishes the defendant with a bill of particulars specifically alleging that the manner in which the defendant distributed the drug was by selling it. *Erickson*, 60 Haw. at 10, 586 P.2d at 1024. Relying on *Erickson*, Reed argues that the trial court should have ordered the prosecution to furnish him with a bill of particulars specifying whether it alleged that Reed sold cocaine.[11] The court's failure to do so, Reed contends, unfairly prevented him from asserting the procuring agent defense. To understand why we reject Reed's argument, some explanation of the procuring agent defense and a review of our relevant caselaw is necessary.

The premise of the defense is that "to sell does not mean to buy," *Erickson*, 60 Haw. at 10, 586 P.2d at 1024, and that one who acts merely as a procuring agent for the buyer is a principal in the purchase, not the sale, and, therefore, can be held liable only to the extent that the purchaser is held liable. *People v. Roche*, 45 N.Y.2d 78, 82, 407 N.Y.S.2d 682, 685, 379 N.E.2d 208, 211, *cert. denied*, 439 U.S. 958, 99 S.Ct. 359, 58 L.Ed.2d 350 (1978).

Because the procuring agent defense negates a "sale," it follows that it is generally available only under a statutory regime that criminalizes the sale of dangerous drugs, but not other forms of distribution. Prior to the legislature's adoption of the Hawai'i Penal Code (Penal Code) in 1972, *see* Act 9, 1972 Haw.Sess.Laws 32–142, such a statutory scheme prevailed in Hawai'i. *See* HRS Chapter 329 (1968). The enactment of the Penal Code, however, radically altered the laws on drug trafficking in Hawai'i. *Kim*, 71 Haw. at 137, 785 P.2d at 942. Among other things, the Penal Code "expanded the proscription to include any 'distribution' of a dangerous drug in any amount." *Id.* It defined "distribution" to be broadly inclusive of the various methods by which drugs pass from one to another: " '[t]o distribute' means

to sell, transfer, give, or deliver to another, or to leave, barter, or exchange with another, or to offer or agree to do the same." Act 9, Part IV, 1972 Haw.Sess.Laws 134.[12] To sell, therefore, simply became one of a number of proscribed means of distribution.[13]

Given the expansive statutory definition of "to distribute" under the Penal Code, we held in *Kelsey* that the procuring agent defense, which negates only a *sale*, was inapplicable to a charge of *distributing* a dangerous drug. 58 Haw. at 240, 566 P.2d at 1373–74.

Soon after our decision in *Kelsey*, we again addressed the applicability of the procuring agent defense to a charge of distributing a dangerous drug. *Erickson, supra*. This time we held that the defense was available, but our opinion made clear that the holding was limited to the peculiar facts of the case before us.

In *Erickson*, the defendant was charged with distributing marijuana in violation of HRS § 712–1247(1)(f). 60 Haw. at 8, 586 P.2d at 1022–23. The trial court ordered the prosecution to provide the defendant with a bill of particulars setting forth the details of the charge, including the manner of distribution. *Id.*, 586 P.2d at 1023. The prosecution furnished a bill that stated that the defendant "offered or agreed to sell" marijuana to an undercover police officer. *Id.* Whether it did so by design or, more probably, by inadvertence, the prosecution thereby restricted itself to proving an offer or agreement to sell, foreclosing the other statutorily proscribed means of distribution, *e.g.*, an offer or agreement to "transfer," "deliver" or "leave." Because the prosecution limited itself to proving what was essentially a pre-Penal Code offense requiring a "sale," we held that the procuring agent defense became available. *Id.* at 10, 586 P.2d at 1024. We distinguished *Kelsey* on the obvious ground that the distribution charge there, unlimited by a bill of particulars, "permitted proof of any act which fell within the statutory definition of

---

**11.** Reed's motion for a bill of particulars sought information concerning "from whom and to whom [Reed] allegedly distributed dangerous drugs, and whether there was a sale of said dangerous drug[.]"

**12.** "Prescribe" was subsequently added to the definition. Act 112, 1979 Haw.Sess.Laws 276.

**13.** "To sell" is defined to mean "to transfer to another for consideration." Act 9, Part IV, 1972 Haw.Sess.Laws 134; HRS § 712–1240 (1985).

'distribute[.]' " *Id.* 60 Haw. at 10, 586 P.2d at 1024. By so distinguishing *Kelsey*, we plainly reaffirmed its holding and limited *Erickson* to its unusual facts.

We made that point even clearer in our decision in *Kim*, where we rejected the defendant's request to overturn *Kelsey* on the basis of *Erickson*, stating that we "expressly limited our holding in *Erickson* to cases in which a bill of particulars limits the [prosecution] to proving 'distribution' by an exchange for consideration[,]" *i.e.*, a sale. 71 Haw. at 138, 785 P.2d at 943. We therefore "reiterate[d] our holding in *Kelsey* that the procuring agent defense is unavailable to a charge of promoting a dangerous drug." *Id.* at 139, 785 P.2d at 943.

Thus, contrary to Reed's argument, our limited holding in *Erickson* does not entitle defendants charged with distributing a dangerous drug to a bill of particulars on the off chance that the prosecution will open the door to an otherwise invalid defense—*i.e.*, make the procuring agent defense available by alleging a sale, rather than the other illegal means of distribution. Neither does it require a court to consider, as Reed implicitly argues, such a possibility when deciding whether to order the prosecution to furnish a defendant with a bill of particulars. Indeed, given our holdings in *Kelsey* and *Kim*, we hold that it would be inappropriate for a court to consider the possibility .that the prosecution might revive the defense. *Erickson* simply stands for the limited proposition that the procuring agent defense becomes available only when a bill of particulars alleges that the defendant distributed a dangerous drug exclusively by selling it, *i.e.*, "transfer[ring] [it] to another for consideration[,]" HRS § 712–1240, and fails to allege any of the other statutorily proscribed methods of distribution. In the absence of such a limiting bill of particulars, the procuring agent defense remains unavailable.

‘ This means, for all intents and purposes, that the prosecution will control the availability of the procuring agent defense. That result, however, is not inconsistent with the Penal Code, which, as we held in *Kelsey* and *Kim*, effectively eliminated the defense by expanding the drug trafficking laws to include persons who distribute, and not simply sell, dangerous drugs.

▇ Accordingly, we hold that the trial court did not abuse its discretion in denying Reed's motion for a bill of particulars, even if the denial effectively foreclosed any possibility that Reed could assert the procuring agent defense.

### B. *Entrapment*

#### 1. *Jury Instruction*

Reed claims that the trial court erred in instructing the jury that he had the burden of proving entrapment beyond a reasonable doubt. The trial court instructed the jury as follows:

Entrapment is an affirmative defense to the charges of promoting dangerous drugs in the first and second degree[s]. A person is entrapped if he engaged in the prohibited conduct because he was induced or encouraged to do so by a law enforcement officer who, for the purpose of obtaining evidence of a commission of an offense, employed methods of persuasion or inducement which created a substantial risk that the offense would be committed by persons other than those who are ready to commit it.

There are two elements of this offense[14], *each of which the defendant must prove by a preponderance of the evidence.* These two elements are:

One, that the defendant engaged in the prohibited conduct because he was induced or encouraged to do so by a law enforcement officer[; a]nd two, that the law enforcement officer did, for the purpose of obtaining evidence of the commission of an offense, employ methods of persuasion or inducement which created a substantial risk that the offense would be committed by persons other than those who are ready to commit it.

---

**14.** Although the trial court misspoke when it referred to entrapment as an "offense," taken in context—especially in light of the court's other express references to the "defense" of entrapment—this obviously inadvertent misstatement was harmless.

If the defendant has proved both elements of entrapment *by a preponderance of the evidence, that is, that it is more likely than not or more probable than not that entrapment occurred,* then you must find the defendant not guilty of any of the offenses in which he was entrapped. If the defendant has not proved *by a preponderance of the evidence* both elements of entrapment, then the defense of entrapment does not apply.

(Emphasis added.)

■ Reed's argument that the instruction was flawed is completely baseless. First, Reed has failed to preserve this issue for review on appeal because he failed to object to the instruction. *State v. Pinero,* 75 Haw. 282, 291, 859 P.2d 1369, 1374 (1993) (citing HRPP 30(e) (1981)). Given that Reed himself submitted the instruction, his failure to object to it is hardly surprising.

■ Second, even if Reed had properly objected to the instruction, his argument would still fail on its merits. The instruction, which tracked the language of HRS § 702–237(1)(b) (1985),[15] plainly required Reed to prove by a preponderance of the evidence that he was entrapped. That is a correct statement of the law. *State v. Nakamura,* 65 Haw. 74, 77, 648 P.2d 183, 186 (1982); *State v. Anderson,* 58 Haw. 479, 484–85, 572 P.2d 159, 163 (1977); *Kelsey,* 58 Haw. at 238, 566 P.2d at 1372–73; *see also* Commentary on HRS § 702–237. Reed's argument, therefore, is frivolous.[16]

### 2. *Sufficiency of the evidence*

Reed also claims that the jury's conclusion that he did not prove that he was entrapped was unsupported by the evidence.[17] He essentially argues that the evidence showed that he was not "predisposed" to committing a "class A" felony and did so only because he was unfairly induced to do so by Wardell. He argues, for instance, that his testimony that he had difficulty in obtaining the amount of cocaine that Wardell wanted and that the cocaine he ultimately delivered in smaller amounts to Wardell was so heavily diluted that it did not amount to "effective business quality cocaine" showed that he was not a "person normally engaged in Class A size drug dealing," but was rather a small-time dealer.[18] He also contends that the evidence showed that Wardell used improper tactics in inducing him to provide the cocaine, including creating false hope that he would help Reed find a place to stay and claiming that he needed the cocaine to alleviate his girlfriend's withdrawal symptoms.

■ When we review the legal sufficiency of the evidence, the question is whether, viewing the evidence in the light most favorable to the State, the record contains substantial evidence to support the conclusion of the trier of fact. *In re John Doe, Born on January 5, 1976,* 76 Hawai'i 85, 92–93, 869 P.2d 1304, 1311–12 (1994). Substantial evidence is credible evidence which is of suffi-

---

**15.** HRS § 702–237(1)(b) (1985) provides in pertinent part:

**Entrapment.** (1) In any prosecution, it is an affirmative defense that the defendant engaged in the prohibited conduct or caused the prohibited result because he was induced or encouraged to do so by a law enforcement officer …, who, for the purpose of obtaining evidence of the commission of an offense,

. . . . .

(b) [e]mployed methods of persuasion or inducement which created a substantial risk that the offense would be committed by persons other than those who are ready to commit it.

**16.** Equally frivolous is Reed's argument that the trial court improperly refused to give two additional instructions on entrapment. The record clearly indicates that these instructions were not given because they were *withdrawn* by Reed's counsel, and not because the court refused to give them. Furthermore, the instruction as given adequately covered the entrapment defense.

**17.** Reed made this argument in his motion for judgment of acquittal, filed on May 14, 1992 and denied on May 19, 1992. That motion was untimely pursuant to HRPP 29(c) (1981) and should not have been entertained by the trial court. *See infra* section II.C.1. Notwithstanding that error, because Reed has appealed directly from his judgment of conviction, we consider his argument as to the sufficiency of the evidence regarding his entrapment defense as properly raised on appeal.

**18.** Reed asserted entrapment as an affirmative defense only to counts 4 through 6; he did not assert it in connection with counts 7 and 8, promotion of a dangerous drug in the third degree, a "class C" felony.

cient quality and probative value to enable a person of reasonable caution to support a conclusion. *Id.* at 93, 869 P.2d at 1312. Based on our review of the record, we hold that there was substantial evidence to support the jury's conclusion that Reed failed to prove entrapment by a preponderance of the evidence.

▮ As an initial matter, Reed's argument that the evidence showed that he was not "predisposed" to committing a "[c]lass A size" felony drug transaction demonstrates a fundamental misunderstanding of the affirmative defense of entrapment that we follow in Hawai'i. "In enacting HRS § 702–237, the legislature adopted the approach of the Model Penal Code which endorsed the objective test of the entrapment defense." *State v. Agrabante,* 73 Haw. 179, 192, 830 P.2d 492, 499 (1992). "Under the objective view, the focus of inquiry is not on the predisposition of the defendant to commit the crime charged, but rather is on the conduct of the law enforcement officials." *Anderson,* 58 Haw. at 483, 572 P.2d at 162. Thus,

> [t]he main concern is whether the conduct of the police or other law enforcement officials was so extreme that it created a substantial risk that persons not ready to commit the offense alleged would be persuaded or induced to commit it. The focus is on the police conduct and its probable effect on a "reasonable person." No attention is directed toward the state of mind of the particular defendant in determining the entrapment issue.

*Id.* at 484, 572 P.2d at 162; *see also Agrabante,* 73 Haw. at 193, 830 P.2d at 499; *State v. Powell,* 68 Haw. 635, 637, 726 P.2d 266, 267 (1986) (per curiam); *Nakamura,* 65 Haw. at 77, 648 P.2d at 186; Commentary on HRS § 702–237. Under HRS § 702–237, then, whether Reed was or was not predisposed to committing the offenses with which he was charged is irrelevant. The relevant question is whether Wardell's conduct "was so extreme that it created a substantial risk that persons not ready to commit the offense[s] alleged would be persuaded or induced to

commit [them]." *Anderson,* 58 Haw. at 484, 572 P.2d at 162.

▮ There was conflicting testimony on that question. As stated above, Reed testified that Wardell used overreaching tactics, including playing on Reed's emotions and offering to find him a place to stay, to induce him into providing cocaine. Wardell, on the other hand, disputed that testimony, denying that he ever offered to help Reed find a place to live or that he tried to induce Reed into giving him cocaine by claiming that he needed it for his "jonesing" girlfriend. Given the conflicting testimony, the trial court properly submitted the entrapment issue to the jury. *See Powell,* 68 Haw. at 638, 726 P.2d at 267–68; *Kelsey,* 58 Haw. at 236–37, 566 P.2d at 1371–72. The jury apparently believed Wardell, finding that Reed had not established entrapment by a preponderance of the evidence. The record shows that there was substantial evidence to support that finding.

### C. Ineffective Assistance of Counsel

Reed claims that his trial counsel rendered ineffective assistance in violation of his constitutional right to assistance of counsel under both the sixth and fourteenth amendments to the United States Constitution and article I, § 14 of the Hawai'i Constitution.[19]

#### 1. Timeliness of motions

Before proceeding to the merits of Reed's arguments, we first address an important procedural issue. Reed raised his ineffective assistance of counsel arguments before the trial court in his motion for new trial, made pursuant to HRPP 33, and alluded to them in his motion for judgment of acquittal, made pursuant to HRPP 29.

HRPP 33 (1981) requires, in pertinent part, that "[a] motion for new trial shall be made within 10 days after verdict or finding of guilty or within such further time as the court may fix during the 10-day period." HRPP 29(c) (1981) similarly requires that "a motion for judgment of acquittal may be made or renewed within 10 days after the

---

**19.** After trial, Reed obtained new counsel, who filed Reed's post-trial motions and represents him on appeal. It is unclear from the record who was responsible for the late filing of post-trial motions.

jury is discharged or within such further time as the court may fix during the 10–day period." HRPP 45(b) (1985) provides, in turn, that "the court may not extend the time for taking any action under Rules 29 [and] 33 ... of these rules ... except to the extent and under the conditions stated in them."

■ The jury found Reed guilty on all counts on March 11, 1992 and was discharged that same day. Reed filed his motions for judgment of acquittal and new trial more than two months later, on May 14 and 15, 1992, respectively. The record before us contains no indication that the trial court granted Reed additional time to file his motions during the ten day period following the jury's verdict and discharge. Pursuant to HRPP 29(c) and 33, then, Reed's motions for judgment of acquittal and new trial were untimely. The trial court nevertheless held a consolidated hearing on the motions on May 19, 1992, denying the motions at the conclusion of the hearing. The court was without authority to waive the time requirements set forth in HRPP 29(c) and 33 and, therefore, was without jurisdiction to entertain Reed's motions for new trial and judgment of acquittal. *See State v. Meafou*, 67 Haw. 41, 44–45, 677 P.2d 459, 462 (1984) (per curiam) (because the time limitations for filing a motion for new trial contained in HRPP 33 are jurisdictional, "the ten day limitation period must be strictly complied with"); *cf. United States v. Hocking*, 841 F.2d 735, 736 (7th Cir.1988) ("a court lacks adjudicatory power to dispose of an untimely motion under [Federal Rules of Criminal Procedure] Rules 29 [and] 33"). Accordingly, the trial court's rulings denying Reed's motions for new trial and judgment of acquittal are null and void.

■ Because the trial court was without jurisdiction to hear Reed's motions, we will treat his claims of ineffective assistance of counsel as being raised for the first time on appeal. We recently held in *State v. Silva*, 75 Haw. 419, 864 P.2d 583 (1993), that claims of ineffective assistance of counsel may be raised for the first time on appeal. We acknowledged in *Silva*, however, that "not every trial record is sufficiently developed to determine whether there has been ineffective

assistance of counsel[.]" *Id.* at 439, 864 P.2d at 592. Thus, we held that

> where the record on appeal is insufficient to demonstrate ineffective assistance of counsel, but where: (1) the defendant alleges facts that if proven would entitle him or her to relief, and (2) the claim is not patently frivolous and without trace of support in the record, the appellate court may affirm defendant's conviction without prejudice to a subsequent [HRPP] Rule 40 petition on the ineffective assistance of counsel claim.

*Id.*, 864 P.2d at 592–593 (footnote omitted). We consider Reed's ineffective assistance of counsel claims with that standard in mind.

### 2. Standards for ineffective assistance of trial counsel

"In any claim of ineffective assistance of trial counsel, the burden is upon the defendant to demonstrate that, in light of all the circumstances, counsel's performance was not objectively reasonable—*i.e.*, within the range of competence demanded of attorneys in criminal cases." *Briones v. State*, 74 Haw. 442, 462, 848 P.2d 966, 976 (1993) (citation and quotation marks omitted). To meet that burden, the defendant must demonstrate: "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Domingo v. State*, 76 Hawai'i 237, 241, 873 P.2d 775, 779 (1994) (citation and quotation marks omitted).

### 3. Witnesses

Reed argues that his trial counsel rendered constitutionally ineffective assistance by failing to call several witnesses whose testimony, he claims, would have bolstered his entrapment defense.

#### a. Police officers

■ Reed claims that his trial counsel's failure to call to the stand several police officers who played minor roles in his arrest impaired his entrapment defense. Although his argument is extremely unclear, Reed seems to argue that the officers would have

testified that Reed was the target of a "sting" operation that was conducted in retaliation for an incident, occurring several years prior to his arrest in this case, in which a police officer was discharged for illegally searching Reed's apartment. Other than his own uncorroborated assertions, Reed points to no evidence in the record indicating what the officers would have testified to if called as witnesses. In the absence of sworn statements from the police officers verifying that, had they been called as witnesses at trial, they would have testified as Reed claims they would, Reed's characterization of their potential testimony amounts to nothing more than speculation and, therefore, is insufficient to meet his burden of proving that his trial counsel's failure to subpoena the police officers as witnesses constituted constitutionally ineffective assistance of counsel. *See United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir.1991) ("evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim" (footnotes omitted)); *see also State v. Montalbo,* 73 Haw. 130, 146, 828 P.2d 1274, 1283 (1992) (defendant failed to meet his burden of proving that his counsel's failure to call an expert witness was ineffective assistance where the defendant failed to "say what an expert witness would have done to alter the court's decision to admit" the prosecution's evidence).

Even if we accepted Reed's characterization of the officers' potential testimony, we still could not say that the failure to call them "resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Domingo,* 76 Hawai'i at 241, 873 P.2d at 779. As noted above, the entrapment defense focuses on the *conduct,* not the motive, of the law enforcement officers. *Anderson,* 58 Haw. at 483, 572 P.2d at 162. In *Nakamura,* we upheld the trial court's ruling that testimony concerning the motive of the arresting officer was irrelevant to the

defendant's entrapment defense and, therefore, was inadmissible. In rejecting the defendant's argument that the testimony was "crucial" to his entrapment defense, we stated:

> We think [defendant] places entirely too much emphasis on the motive of the government in effecting his arrest.... [T]he focus of the entrapment defense is the conduct of the law enforcement officials in soliciting the cooperation of the accused. The inquiry is whether the methods of persuasion on the part of the officials were so extreme that it would induce a "reasonable [person]" to commit the offense charged. The motives of the agents in this case then, while reprehensible, [are] wholly without relevance to the issue in light of the rather mechanical determination to be applied.

65 Haw. at 81, 648 P.2d at 188. Reed claims that the police officers' testimony would have established their retaliatory motives. Under *Nakamura,* that testimony would not have been relevant. As such, Reed's trial counsel's failure to call the officers to the stand could not have resulted in the withdrawal or substantial impairment of his entrapment defense.

Finally, Reed fails to acknowledge that he had an opportunity to interview the police officers and call them as witnesses. The trial court recessed his trial for a full day so that Reed and his attorney could interview the officers to determine if they would present favorable testimony. Several of the officers were interviewed, but when the trial resumed, none were called. Reed has pointed to nothing in the record indicating that the decision not to call the police officers was anything other than an informed tactical decision made by his attorney. We have said that the decision whether to call a witness in a criminal trial is normally within the judgment of counsel and, therefore, will rarely be second-guessed by judicial hindsight. *State v. Aplaca,* 74 Haw. 54, 70, 837 P.2d 1298, 1307 (1992). Reed has provided us with no reason to depart from that rule in this case.[20]

---

**20.** Reed makes a vague assertion that the trial court refused to permit him to call the police officers as witnesses and seems to claim that that refusal violated his constitutional right to confront the witnesses against him. Not only is there is no evidence in the record that the court

#### b. *Williams*

■ Reed also argues that his trial counsel should have interviewed and called Williams as a witness. Reed alleges that his trial counsel failed to interview Williams before trial, despite her availability. Had he done so, Reed argues, he would have found that Williams was willing to testify that Wardell used coercive tactics, including threats, to induce Reed to provide him with cocaine. He also asserts that Williams would have corroborated that Wardell was extremely persistent and that he claimed that he needed cocaine for his drug-addicted girlfriend. Reed's unverified assertions concerning his trial counsel's failure to interview Williams, her willingness to testify and the substance of her potential testimony are insufficient to meet his burden of proving ineffective assistance of counsel. *See Ashimi*, 932 F.2d at 650.

#### 4. *Procuring agent defense instruction*

■ Reed claims that his trial counsel rendered constitutionally ineffective assistance by failing to request a jury instruction on the procuring agent defense. In light of our holding above that the procuring agent defense was not available, the failure of Reed's trial counsel to request an instruction on the defense did not "result in the withdrawal or substantial impairment of a potentially meritorious defense." *Domingo*, 76 Hawai'i at 241, 873 P.2d at 779.

#### 5. *Purity analysis*

■ Reed asserts that his trial counsel should have obtained an expert analysis of the white powder that he provided to War-

dell to determine how much "pure" cocaine it contained. He argues that such an analysis would have shown that cocaine comprised only a small proportion of the powder and that the remainder was non-narcotic filler. He claims that the small amount of cocaine in the powder "technically fit into the definition of De Minimus [sic]." We assume that Reed's argument is that his trial counsel's failure to obtain proof of the relatively small amount of cocaine in the powder prevented him from requesting a dismissal of the charges pursuant to HRS § 702–236 (1985), which permits the court to dismiss a prosecution if it finds that the conduct alleged constituted a *de minimis* infraction.[21]

Reed's argument is without merit. First, he has failed to present any evidence that the white powder in fact contained only very small amounts of pure cocaine. Even assuming that it did, however, dismissal of a prosecution pursuant to HRS § 702–236 is within the broad discretion of the court, *see* Supplemental Commentary on § 702–236 (quoting Sen.Conf.Comm.Rep. No. 2, in 1972 Senate Journal, at 741), and is not a defense, as Reed suggests. *See* HRS § 701–115(1) (1985) (defining "defense" as "a fact or set of facts which negatives penal liability"). Moreover, we have previously stated that in most cases "[t]raffic in narcotics can hardly be said to be a de minimis offense." *State v. Schofill*, 63 Haw. 77, 84, 621 P.2d 364, 370 (1980) (citing *State v. Caldeira, Jr.*, 61 Haw. 285, 602 P.2d 930 (1979)); *cf. State v. Vance*, 61 Haw. 291, 307, 602 P.2d 933, 944 (1979) (although "the possession of a microscopic amount [of a dangerous drug,] in combination with other factors indicating an inability to use or sell the narcotic, may constitute a de

---

refused Reed's requests to call the police officers as witnesses, but, as noted, the evidence indicates that the court gave Reed every opportunity to interview and call the officers to the stand. Reed's argument, therefore, is wholly without merit.

21. HRS § 702–236 (1985) provides:

**De minimis infractions.** (1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

    (a) Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or

    (b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

    (c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

    (2) The court shall not dismiss a prosecution under subsection (1)(c) of this section without filing a written statement of its reasons.

minimis infraction within the meaning of HRS § 702–236 and, therefore, warrant dismissal of the charge otherwise sustainable under HRS § 712–1243[,] . . . the possession of .7584 gram of white powder containing cocaine" was not a *de minimis* infraction).

Reed also argues that his trial counsel's failure to obtain an analysis of the composition of the white powder that he provided to Wardell prevented him from negativing the prosecution's evidence that he "knowingly and voluntarily engaged in a Class A drug transaction." Although the exact nature of Reed's argument is unclear, we assume that the premise is that HRS § 712–1241(1)(b)(ii)(A) does not proscribe the knowing distribution of substances containing relatively small concentrations of pure cocaine. That premise is incorrect. HRS § 712–1241(1)(b)(ii)(A) provides that a person commits the offense of promoting a dangerous drug in the first degree if he or she knowingly distributes "[o]ne or more preparations, compounds, mixtures, or substances of an aggregate weight of . . . [o]ne-eighth ounce or more, containing . . . cocaine or any of [its] respective salts, isomers, and salts of isomers[.]" The statute plainly does not make commission of the offense contingent on the relative concentration of "pure" cocaine in the "preparations, compounds, mixtures, or substances" distributed. Thus, even assuming as true Reed's unsubstantiated assertion that the white powder contained a proportionately small amount of cocaine, that fact would not have been a meritorious defense to the charge of promoting a dangerous drug in the first degree, in violation of HRS § 712–1241(1)(b)(ii)(A).[22]

Finally, Reed claims that the lack of a purity analysis of the white powder impaired the presentation of his entrapment defense. Again, the basis of his argument is unclear. It appears to be that the supposed fact that the white powder was heavily diluted with a non-narcotic substance would have (1) corroborated his claim that he was not predisposed to committing a "class A felony" and (2) been circumstantial evidence that he was

entrapped into providing Wardell with a "class A" (*i.e.*, more than one-eighth ounce) amount of cocaine-containing powder. First, as already noted, Reed's predisposition to committing the offense is irrelevant to his entrapment defense. *Anderson*, 58 Haw. at 483, 572 P.2d at 162. Second, even assuming that the cocaine was heavily cut, we think that that fact would have been of such marginal value in substantiating Reed's testimony that he was entrapped that his trial counsel's failure to obtain evidence of the concentration of cocaine in the white powder did not substantially impair Reed's entrapment defense.

Accordingly, we hold that the failure of Reed's trial counsel to obtain a "purity" analysis of the white powder did not "result in the withdrawal or substantial impairment of a potentially meritorious defense" and, therefore, did not constitute ineffective assistance of counsel. *Domingo*, 76 Hawai'i at 241, 873 P.2d at 779.

### 6. *Other*

Reed makes vague assertions of several other errors made by his trial counsel, including the failure to: file a motion to suppress evidence (which Reed fails to identify); exercise peremptory challenges to include more men on the jury; make a sufficient number of objections at trial; file a motion to dismiss the indictment against Reed as discriminatory; object to the court's refusal to use two of Reed's proposed jury instructions; and failure to obtain a "voice analysis" of a taped telephone conversation admitted into evidence. Reed fails to provide sufficient citation to the record or make discernible arguments to support his claims that these asserted errors amounted to ineffective assistance. *See Hall v. State*, 10 Haw.App. 210, 218, 863 P.2d 344, 348, *cert. denied*, 76 Hawai'i 246, 868 P.2d 464 (1993) (court may disregard points of error raised when the appellant fails to present discernible arguments supporting those assignments of error). To the extent that we can discern even a semblance of an intelligible argument re-

---

22. Reed raised a similar argument in a pre-trial motion to dismiss count 6. To the extent that he assigns the trial court's denial of that motion as a

point of error on appeal, we hold that the denial was proper.

garding how each of these asserted errors amounted to ineffective assistance of counsel, we hold that those arguments are without merit.

### 7. *Rule 40*

██ Of the various errors that Reed claims his trial counsel made, we find that only one, his claim that Williams should have been interviewed and called as a witness, "if proven would entitle him ... to relief" and "is not patently frivolous and without trace of support in the record[.]" *Silva,* 75 Haw. at 439, 864 P.2d at 592. If, as Reed alleges, Williams would have testified that Wardell used coercive tactics to get Reed to sell him cocaine, that testimony would have bolstered Reed's entrapment defense and possibly raised at least some doubt about the credibility of Wardell's testimony. His counsel's failure to interview Williams and to subpoena her to testify, therefore, would amount to constitutionally ineffective assistance. *See State v. Aplaca,* 74 Haw. at 67–73, 837 P.2d at 1305–08 (defense counsel's failure to conduct pretrial investigation of prospective defense witnesses whose testimony would have bolstered defendant's credibility and her sole defense and impeached the victim's credibility constituted ineffective assistance of counsel). Accordingly, our rejection of Reed's claim that his trial counsel's failure to interview and subpoena Williams amounted to ineffective assistance is without prejudice to a subsequent Rule 40 petition.

None of the other errors that Reed asserts as a basis for his ineffective assistance of counsel claim satisfy the standard set forth in *Silva.* Accordingly, our holding that those alleged errors do not constitute ineffective assistance of counsel is with prejudice to a subsequent Rule 40 petition. That is, Reed may not assert those errors as a basis for an ineffective assistance of counsel claim in a subsequent Rule 40 petition.

### D. *Equal Protection*

Reed argues that his right to equal protection of the laws under the United States and

Hawai'i Constitutions was violated because he was charged with violating HRS § 712–1241(1)(b)(ii)(A), a class A felony, while his codefendants Williams and Peralta were not. Although not clearly set forth, Reed's argument seems to be that his race (Reed is an African–American) was the basis for the alleged discriminatory prosecution.

██ Reed has the burden of proving that he was the subject of a discriminatory prosecution. *State v. Kailua Auto Wreckers, Inc.,* 62 Haw. 222, 226, 615 P.2d 730, 734 (1980). To sustain that burden, Reed must satisfy a two part test. First, he must demonstrate that he was singled out for prosecution while others similarly situated were not. *See Mahiai v. Suwa,* 69 Haw. 349, 361, 742 P.2d 359, 368 (1987). Second, he must show that his prosecution was " 'deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification.' " *Id.* (quoting *Kailua Auto Wreckers,* 62 Haw. at 227, 615 P.2d at 734–35). If he fails to meet his burden of establishing either part of the test, Reed's equal protection claim fails. *Id.*

██ Even assuming, *arguendo,* that Reed's assertions that Peralta and Williams were similarly situated but dissimilarly charged satisfies the first part of the test, he has failed to meet his burden of establishing the second part, *i.e.,* that his prosecution was deliberately based upon an unconstitutional consideration. As noted, Reed seems to suggest that his race played a role in his prosecution for violation of HRS § 712–1241(1)(b)(ii)(A). He offers no evidence, however, to establish racial animus in the prosecution's charging decision. He merely argues that the fact that his codefendants faced lesser charges is evidence of some discriminatory purpose.[23] That assertion is insufficient. As we stated in *Kailua Auto Wreckers:*

> The burden of proving discriminatory enforcement of the law rests upon the party raising the defense. That party must present sufficient evidence to establish the existence of intentional or purpose-

23. Reed asserts that Williams is an African–American. It is difficult to square that assertion with Reed's claim that he was charged with a

more serious offense than his co-defendants because of his race.

ful discrimination.... It is insufficient to show merely that other offenders have not been prosecuted, or that there has been laxity of enforcement, or that there has been some conscious selectivity in prosecution. Recognition of the defense will not permit the guilty to go free simply by showing that other violators exist.

62 Haw. at 227, 615 P.2d at 734–35 (citations and footnote omitted).

Reed's assertion that racism is endemic in the criminal justice system in the United States is similarly insufficient to establish a discriminatory purpose. Reed asserts that statistics show that there is a disproportionately high rate of incarceration among young black males in the United States. Assuming those general statistics are accurate, they do not establish that the "decision-makers in *his* case acted with discriminatory purpose." *McKleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987).

Accordingly, we hold that Reed's equal protection claim fails.[24]

### E. *Sufficiency of evidence*

■ Reed finally argues that the evidence was insufficient to support the jury's guilty verdict on count 6, promoting a dangerous drug in the first degree in violation of HRS § 712–1241(1)(b)(ii)(A). He claims that the evidence showed that his last deal with Wardell on the evening of December 27, 1989—the basis for count 6—actually consisted of three separate transactions, because he delivered the drugs in three separate paper bindles. None of those bindles, he argues, weighed one-eighth ounce or more as required by HRS § 712–1241(1)(b)(ii)(A). He therefore argues that there was "absolutely no evidence that [he] had in his possession at any one time the necessary single container holding an aggregated (diluted) one-eighth of an ounce of cocaine, its salts or isomers."

Contrary to Reed's assertion, nothing in HRS § 712–1241(1)(b)(ii)(A) requires that the defendant "possess[ ] at any one time" one-eighth ounce or more of a cocaine-con-

taining substance or that the substance be delivered all at once in a "single container." Indeed, because a person "distributes" a dangerous drug when he or she "offer[s] or agree[s]" to sell, transfer, give, etc. the drug to another, HRS § 712–1240, *actual* delivery of the contraband in such cases is not required at all. *State v. Schofill*, 63 Haw. at 81, 621 P.2d at 368.

Wardell testified that during the evening of December 27, 1989, Reed agreed to give, and actually delivered to him, a cocaine-containing substance weighing more than one-eighth ounce in the aggregate. He also testified that Reed gave him the drugs in three separate bindles simply because Reed believed that that would somehow minimize the risk that he would be charged with a class A felony if he were caught. We hold that Wardell's testimony constituted substantial evidence supporting the jury's verdict finding Reed guilty of promoting a dangerous drug in the first degree in violation of HRS § 712–1241(1)(b)(ii)(A).

### III. *CONCLUSION*

For the foregoing reasons, we affirm the judgment of conviction on all counts.

---

**24.** To the extent that Reed argues that his trial counsel's failure to file a motion to dismiss count 6 of the complaint on equal protection grounds constituted ineffective assistance of counsel, that argument is rejected.