134 P.3d 607

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Scott MIKASA, Defendant–Appellant.**

**No. 25776.**

Intermediate Court of Appeals of Hawai'i.

April 7, 2006.

Certiorari Granted May 5, 2006.

Josette Anne Wallace, Warner & Wallace, on the briefs, for Defendant–Appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

1. The Honorable Joseph E. Cardoza presided

Opinion of the Court by LIM, J.

In this consolidated appeal (Nos. 25776, 25777 and 25778 under 25776), Scott Sunao Mikasa (Defendant or Mikasa) appeals the three March 24, 2003 amended judgments that the Circuit Court of the Second Circuit (circuit court) entered in Cr. No. 02–1–0090(3) (case 090) (No. 25776), Cr. No. 02–1–0498(3) (case 498) (No. 25777), and Cr. No. 03–1–0036(3) (case 036) (No. 25778), respectively.[1]

Defendant contends his counsel rendered ineffective assistance in allowing him to plead no contest without adequate time for investigation and discovery. Defendant also argues that the circuit court abused its discretion in relying upon an uncharged conspiracy in fashioning its sentence. We disagree on both points, and affirm.

## I. Background.

In the words of the presentence investigator, presented here verbatim:

**Cr. No. 02–1–0090(3):**

. . . .

The police investigation reveals that on February 14, 2002, Search Warrant # 2002–36 was executed at 37 Kono Place, Kahului, a residence being occupied by Scott Mikasa, Peter Kamalii, Jonathan Buesa, Jason Bio and Patrick Racadio. Search Warrant 2002–37 was executed upon Scott Mikasa's person at the said location.

As a result of Search Warrant # 2002–36, the search of a black bag that was next to Mikasa resulted the recovery of the following:

Item # 1: Twenty (20) ziplock packets possessing crystal methamphetamine with the combined net weight of 2.20 ounces.

Item # 2: .29 grams of Marijuana

Item # 3: Numerous clear plastic packets

Identification of Mikasa and Kamalii were recovered from the black bag.

A search within a black bag that was next to Buesa resulted the recovery of the following:

over all three cases.

Item # 1: Two (2) ziplock packets possessing suspected crystal methamphetamine with the combined net weight of 4.88 grams.

Item # 2: .04 net grams of marijuana

Item # 3: Numerous clear plastic packets

Item # 4: Digital scales

Item # 5: $1,280 in U.S. Currency

Identification of Buesa were recovered from within said bag.

Upon informing Bio of his Constitutional Rights, Bio claimed ownership of a blue fanny-pack that was in the middle of the livingroom floor. As a result of searching the fanny pack, a glass pipe (scraped out .16 grams of Crystal Methamphetamine), .57 grams of Marijuana vegetation, plastic packets, scrapper and other drug related paraphernalia.

Also recovered were several glass dishes/containers possessing methamphetamine residue, a clear ziplock bag possessing marijuana vegetation with a net weight of .16 grams.

As a result of Search Warrant # 2002–37, Mikasa's person was search. Found was $1,872.00 in cash, identification of Mikasa, and a packet possessing .54 grams was recovered from his shorts pocket.

. . . .

Scott Mikasa, Peter Kamalii, Jonathan Buesa, Jason Bio and Patrick Racadio were placed under arrest. Mikasa, Buesa, Kamalii and Racadio did not want to provide a statement.

*Statement of Jason Bio:*

After advising his constitutional rights, Bio offered the following statement:

Bio stated that he was born on Maui and graduated high school from Baldwin High in 1993. He work at Maui Paper and Chemical and he has known Scott Mikasa and Peter Kamalii for about five (5) to six (6) months.

He said that he smokes Crystal Methamphetamine at about .5 grams over a three (3) to four (4) day period. He reported that Scott Mikasa and Kamalii often travel between Honolulu and Maui. He does not know if Mikasa and Kamalii sell Crystal Methamphetamine.

**Cr. No. 02–1–0498(3):**

. . . .

The police investigation reveals that on May 31, 2002, while the police were searching the residence located at 503 Kamehameha Avenue pursuant to a search warrant being known to be involved with the distribution of illegal narcotics, Scott Mikasa knocked at the door of the said residence.

Officer Esperanza opened the door and recognized Mikasa from past history of drug cases. Mikasa asked if "Walter" was home. When the officer asked what he wanted for Walter, he said that he wanted to know if "Walter" wanted to go fishing.

Mikasa appeared to be nervous as if he had recognized that he was talking to a police officer, he immediately turned around and walked down the stairwell down to an awaiting vehicle MDC–888.

Seated in the driver side of the vehicle was a male later identified as Joel Chang. At this time the officer asked Chang for his consent to search Vehicle MDC–888.

While searching the vehicle a backpack was observed on the front seat. Chang stated that the backpack belonged to Mikasa.

The officer asked Mikasa if he would be willing to have the backpack be search which Mikasa said "no." A canine screening was then conducted. The canine had alerted to the backpack.

On May 31, 2002, Scott Mikasa was placed under arrest after Officer Greg Alejo's canine "Wielco" alerted to the backpack that belonged to Mikasa.

Mikasa did not want to provide a statement.

On May 31, 2002, Search Warrant # 2002–112 was executed on the defendant's backpack. As a result of the search, a crystal like substance suspected to be Crystal Methamphetamine, green vegetation purported to be Marijuana was recovered along with other items associated with drug paraphernalia.

The weight of the Crystal Methamphetamine was 0.03 grams and was tested positive NIK Kit "U".

**Cr. No. 03–1–0036(3):**

. . . .

The police investigation reveals that on January 6, 2003, Officer Randy Esperanza of the Vice Division obtained search warrants 2003–1 and 2003–1 from Judge Rhonda Loo for Scott Mikasa and at the residence located at 705 Komo Place, Kahului. At about 1:05 p.m., the officers arrived at the residence located at 705 Komo Place. Scott Mikasa was observed standing in the garage and when he noticed the officers he began to walk in a haste toward the house fumbling with a small black back pack in his hand.

When the police announced their presence, Mikasa continued to walk into the residence. He threw the small black back pack onto the living room floor near the feet of a male sitting at a computer.

Two (2) females were observed in the living room near the male at the computer. As the police ran up to Mikasa, he had his left hand in his left pocket, however, he was unable to discard any possible evidence. He was immediately ordered to remove his hand from his pocket. The officer grabbed him by the neck and guided him to the floor. Mikasa was given a copy of the search warrant SW 2003–1. The male within the residence was identified as George Ballao, Jr. He was also advised of the search warrant 2003–2 to conduct a search of the residence.

*Evidence Recovered:*

Item # 1: Fourteen (14) plastic ziploc packets containing an opaque crystalline substance suspected that of Crystal Methamphetamine. Total net weight of 94.67 grams. Bags # 1–12 were recovered within a Kodak film box located within a black mini Eastsport backpack. Bags 13–14 were recovered from within Scott Mikasa's front right side shorts pocket.

Item # 2: United States currency consisting of thirty-four (34) one hundred dollar bills, twelve (12) fifty dollar bills, two hundred thirty-one (231) twenty dollar bills, twelve (12) ten dollar bills. Total: $8,763.00. The monies were recovered from Mikasa's front and the right side of his shorts pocket.

Item # 3: Two (2) State of Hawaii identification cards for Scott Mikasa.

Item # 4: One (1) black Eastsport mini backpack that was thrown on the living-room floor.

Item # 5: Two (2) empty plastic ziploc packets used to contain Item # 1 bags 1–12 and one (1) empty kodak film box used to contain item # 1.

*Arrest Made:*

At about 2:11 p.m., Scott Mikasa was placed under arrest and was transported to the Wailuku Police Station.

. . . .

Scott Mikasa did not want to provide a statement without consulting his attorney.

In case 090, Defendant was indicted on February 22, 2002 for promoting a dangerous drug in the first degree (count one), unlawful possession of drug paraphernalia (count two), attempted promoting a dangerous drug in the first degree (count three), promoting a detrimental drug in the third degree (count four), promoting a detrimental drug in the third degree (count five), promoting a dangerous drug in the first degree (count six), unlawful possession of drug paraphernalia (count seven), promoting a controlled substance in or near schools (count eight), promoting a dangerous drug in the third degree (count nine) and unlawful possession of drug paraphernalia (count ten).

On March 12, 2002, Defendant made his first record appearance via a request for disclosure filed by his attorneys, Jonathan E. Burge (Burge) and Jonathan L. Inciong (Inciong). The next day, Burge and Inciong filed for supervised release or reduction of bail. Bail was halved to $100,000, and Defendant bonded out on March 22, 2002.

In ensuing filings in case 090, Burge and Inciong moved, with partial success, to compel disclosure of the search warrant and its supporting affidavit; successfully opposed the State's motion to consolidate Defendant's case with Peter Kamali'i's case; moved to compel disclosure of the confidential informant, which motion was later withdrawn; unsuccessfully moved to suppress evidence for improper execution of the search war-

rant; and successfully moved for a bill of particulars.

Case 498 commenced on September 16, 2002, with Defendant's indictment for promoting a dangerous drug in the third degree (count one), unlawful use of drug paraphernalia (count two) and promoting a detrimental drug in the third degree (count three). Defendant was arrested on the grand jury bench warrant on September 25, 2002, and bail was set at $20,000. On September 30, 2002, a court officer recommended that bail be reduced, but on October 2, 2002, before any action could be taken on the bail amount, Defendant bailed out on a $20,000 bond.

On October 14, 2002, James P. Brumbaugh (Brumbaugh) was appointed counsel for Defendant in case 498. Brumbaugh obtained the grand jury transcript and litigation expenses of $500 before Burge and Inciong substituted as counsel on January 23, 2003.

On January 9, 2003, Defendant's bail in case 090 was revoked on account of his arrests under cases 498 and 036. The arrest warrant was served on Defendant in cellblock. In case 498, Defendant's bail company discharged itself on January 14, 2003 by surrendering Defendant where he was confined at the Maui Community Correctional Center. On January 21, 2003, case 036 commenced with a complaint charging Defendant with promoting a dangerous drug in the first degree (count one) and unlawful possession of drug paraphernalia (count two).

On January 23, 2003, Defendant pled no contest in all three cases pursuant to a plea agreement,[2] to which the circuit court bound itself under Hawai'i Rules of Penal Procedure Rule 11(e)(1) (2003). Under the plea agreement, Defendant was to plead guilty or no contest to counts one, three and six in case 090, and to all counts in cases 498 and 036. In return, the State agreed to *nolle prosequi* the seven other counts in case 090, and to argue for no more than two consecu-

tive twenty-year terms of imprisonment overall, with a joint recommendation of mandatory minimums of no more than five years.

At the change of plea hearing, Defendant was represented by Inciong. Defendant first waived indictment in case 036, tendering a waiver-of-indictment form he had signed along with his attorney. Then, the circuit court engaged Defendant in a comprehensive colloquy, geared to all three cases, regarding the rights he would relinquish by pleading no contest.

In the course of the colloquy, the following exchange occurred:

[THE COURT]: Now, I'm going to ask counsel if you have—counsel, if you've had a full opportunity to completely discuss all possible defenses with Mr. Mikasa?

MR. INCIONG: Yes, your Honor.

THE COURT: Are there any particular defenses that you feel the Court should cover with Mr. Mikasa today?

MR. INCIONG: No, there are none, your Honor.

BY THE COURT:

Q. All right, Mr. Mikasa, I've asked your attorney two questions with respect to possible defenses. Do you agree with his responses?

A. Yes.

Defendant also answered "yes" to both of the following queries of the circuit court:

Now, is the following statement true as it applies to you with respect to all eight of the charges to which you wish to enter pleas of no contest: "I plead no contest because after discussing all the evidence and receiving the advice on the law from my lawyer, I do not want to contest the charges against me." Is that true as it applies to all eight charges?

. . . .

Mr. Mikasa, do you agree with the statement of your attorney, that you are stipu-

---

2. The State's January 21, 2003 plea offer provided:

This offer shall expire on January 23, 2003, or until any pretrial motions are heard, whichever is sooner. Please advise me of your client's position on or before that date.

. . . .

This offer is good only until the deadline indicated above. If your client does not accept the offer by that date, the offer expires. If your client wishes to change his plea after the plea offer expires, there will be no agreement as to sentencing.

(Bolding in the original.)

lating, in other words agreeing, that for purposes of entry of these please [ (sic) ] of no contest to each of these eight charges, there is a—there are facts to support each of the eight charges such that if the cases proceed to trial, the government would be able to meet its burden of proving each of the eight charges beyond a reasonable doubt?

At the end of the change-of-plea hearing, just before tendering his pleas, Defendant identified his signature on each of the no-contest plea forms and acknowledged his complete understanding of the advisement of rights contained in the forms. Defendant had the following final exchange with the circuit court:

Q. Do you have any complaints about either of your attorneys, either Mr. Inciong or Mr. Burge, with respect to these three cases?

A. No.

Q. How about with respect to Mr. Brumbaugh?

A. No.

Q. All right. Are you satisfied with what all of your attorneys have done for you in all three cases?

A. Yes.

. . . .

Q. Mr. Mikasa, I'm about to ask you for your pleas to each of these eight charges, but before I do so, I want to make sure that you understand a couple things. One is you're not required to enter pleas of no contest today. Do you understand that?

A. Yes.

Q. Second, if you do enter pleas of no contest today, you will not be allowed to withdraw those pleas at a later time unless there's some extremely unusual circumstances presented to the Court. Do you understand that?

A. Yes.

For the sentencing hearing, the twenty-eight-year-old Defendant wrote a letter to the circuit court, quoted here verbatim but sans the author's emendations:

My drug addiction is the real reason that I'm here today. It's true that I'm responsible for everything I'm charged with, but there are other facts to this case that I would like to present before you pass sentence.

Crystal methamphetamine is my addiction. I am totally addicted to this drug, and this drug alone. I don't drink, smoke, or do any other drug but ice.

Everyday, all day. 24/7. I didn't have a life. Ice was my life. I was powerless.

I was not the type of "drug dealer" that most people would refer to as a "dealer", because what I did was the best way I knew for me to support my drug habit.

I never did it for the money, or the girls, the cars, jewelry, or anything else.

I was just an errand boy. I picked up and I delivered drugs and cash in return for my own personal supply. And as long as I had my dope I was happy. I didn't make any money for myself because I didn't want any. I just wanted my dope. I've been in car accidents because I fell asleep while driving because I was up for days with no sleep.

I didn't eat, didn't sleep, and a lot of times I didn't even take a bath.

Just normal everyday things were non-existent. I didn't have friends. I didn't have a girlfriend. Ice was my girlfriend, my friend, my enemy, my mom, my dad, my everything.

It was sickening. And I couldn't stop. I knew it wasn't good for me and that it would eventually destroy me, but I still couldn't stop. Ice had total control of the life I was living. I am a drug addict and I need help. This is a very powerful and deadly drug. If I was released right now I would still smoke ice. That's how much power it has on me. I'm sorry for the things I've done, and the people I've hurt. I didn't mean to hurt anyone. I've been doing some soul-searching, but it's still a little confusing and unclear.

There are a lot of things I can't remember. All I know now is that even with the reality of facing prison, I still crave for ice.

I just can't understand it.

At the March 20, 2003 sentencing hearing, Inciong told the circuit court that, although "the record before you is not pretty," Defendant's letter indicated that he recognized the depth of his addiction. Inciong also pointed out that Defendant had no prior convictions.[3] Inciong thus argued for a rehabilitative sentence, but in any event, one not exceeding concurrent prison time.

The deputy prosecuting attorney (DPA), on the other hand, pointed to the multiple drug offenses committed close in time, the distribution-level amounts involved and the concomitant harm to society, in arguing for consecutive twenty-year terms of imprisonment. In the course of the State's argument, the circuit court commented:

THE COURT: If I'm reading his letter, it would appear that he is—if I'm reading it correctly, he's conceded that he was dealing.

[DPA]: Yes, your Honor.

THE COURT: I know you made some arguments about that, but it seems he's come out and stated that. I mean, perhaps he phrases it a little differently, but talks about the fact that he "... was not the type of drug dealer that most people would refer to as a dealer, because what I did was the best way I knew for me to support my drug habit."

The circuit court sentenced Defendant to a twenty-year indeterminate term of imprisonment for each of the three surviving counts of case 090, concurrent; a five-year indeterminate term of imprisonment for each of counts one and two and thirty days in jail for count three of case 498, concurrent; and twenty-year and five-year indeterminate terms of imprisonment for counts one and two, respectively, of case 036, concurrent. The circuit court ran the prison terms in case 036 consecutively to the prison terms it imposed in cases 090 and 498. In addition, the circuit court imposed a five-year mandatory minimum for each of the indeterminate twenty-year prison terms, along with a two-and-a-half-year mandatory minimum for count one of case 498.

Immediately after imposing its sentence, the circuit court had some unsolicited advice for Defendant:

To you, the message I want to send, Mr. Mikasa, is that there is hope and there is light at the end of the tunnel if you do what you need to do with your life. If you do that, the court, and I'm sure the Department of Public Safety, will be very supportive of those efforts. But you have to demonstrate that through conduct. Your words alone will not do it, because your conduct has spoken volumes here.

On the other hand, if you, through your conduct, demonstrate that you haven't learned from this, then in the court's view, given the harm that you caused society by your conduct, you should serve every bit of those 40 years in prison.

So what I'm saying to you is that your future is in your hands. You will determine your future, and the future of your child, and to a certain extent—I don't mean to suggest that you are going the [ (sic) ] make all decisions for your child, but certainly in terms of your child's contact with you, you have a great deal of control over that as well. So it's going to be squarely up to you, Mr. Mikasa.

What are you going to do with this? How are you going to—are you going to turn this into a positive or—

THE DEFENDANT: Yeah.

THE COURT: And, of course, you know, I want others to understand, Mr. Mikasa, because I know they will have contact with you and they are going to want to know what happened. Clearly, you are involved in—well, I shouldn't say clearly, but it certainly appears from the record that there is, based on what you have told me, a conspiracy to distribute drugs here in the State of Hawaii, a very active one. And so I would imagine that some of those that are involved with you are going to be kind of curious as to what happens to you, and other individuals that think about coming to this community and distributing drugs or possessing drugs of this nature will likewise be interested.

---

**3.** The presentence diagnosis and report shows several arrests for assault, theft and drug of- fenses during the period 1993–1998, but no convictions.

And the clear message is to them—and you can share with them if they are—is that there is a very heavy price to be paid.

I'm sure you don't want to spend from now until age 60 in prison. But if you don't get your act together, that's what's going to happen. I hope it doesn't happen, by the way, but that's certainly what can happen.

## II. Discussion.

Defendant raises two points of error on appeal. His statement of his points not only presages, but also summarizes quite comprehensively, the arguments to follow:

A. SCOTT MIKASA WAS DENIED HIS CONSITUTIONAL [ (sic) ] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS NEW COUNSEL ALLOWED PLEAS OF NO CONTEST TO BE ENTERED, ESPECIALLY IN CR. NO. 03–1–0036, WITHIN TWO DAYS OF THE COMPLAINT BEING FILED, WITHOUT THE POSSIBLE BENEFIT OF ADEQUATE DISCOVERY OR INVESTIGATION INTO THE ALLEGED OFFENSES.

Counsel for Scott Mikasa entered his appearance only two days after the complaint was filed in the 2003 case. On the same day, he allowed his client to plead no contest to all three cases, including the 2003 matter in which the defendant was exposed to—and received—a twenty-year sentence, running consecutive to the other case sentences.

There is simply no possibility that counsel Inciong could have received adequate discovery or adequately investigated any of the three pending cases in the short time he was counsel of record before the change of plea. Particularly in the 2003 case, which had only been charged two days prior to the change of plea, it was impossible for Mr. Inciong to have adequately investigated the case. It was also impossible for Mr. Mikasa to have an informed discussion of the consequences of his change of plea with counsel, and time to consider his options.

Scott Mikasa did not receive effective assistance of counsel as guaranteed by the U.S. and Hawaii State Constitutions.

B. THE SENTENCING JUDGE EXCEEDED HIS DISCRETION IN PLACING UNDUE CONSIDERATION ON A POSSIBLE UNCHARGED CONSPIRACY IN DETERMINING MR. MIKASA'S SENTENCE.

In sentencing Mr. Mikasa for his first and only conviction, Judge Cardoza referred to a possible conspiracy in which the defendant may have been involved, and strongly considered that conspiracy in fashioning his sentence. From the record, it appears to have been the key factor in assigning consecutive terms of imprisonment to the defendant.

[I]t certainly appears from the record that there is, based on what you have told me, a conspiracy to distribute drugs here in the State of Hawaii, a very active one. And so I would imagine that some of those that are involved with you are going to be kind of curious as to what happens to you ... And the clear message is to them ... there is a very heavy price to pay.

Allegations of a conspiracy had not been made by the State, and Mr. Mikasa was certainly not adjudicated beyond a reasonable doubt to have participated in a conspiracy. The heavy reliance of the sentencing judge on this alleged conspiracy was an abuse of discretion.

Opening Brief at 4–6 (citations to the record omitted).

### A.

▆ Putting to one side the erroneous impression sought by Defendant—that Inciong first represented Defendant at the change-of-plea hearing, when in fact Inciong was involved from the start of the earliest case—we discern an obvious tactical basis for accepting a time-sensitive plea proposal which would dismiss seven counts and forestall further consecutive sentencing and higher mandatory minimums, especially where there were multiple drug offenses committed close in time despite prior and intervening

arrests, involving large, distribution-level amounts of crystal methamphetamine. Once neglected, the plea offer might never be tendered again. "General claims of ineffectiveness are insufficient and every action or omission is not subject to inquiry. Specific actions or omissions alleged to be error but which had an obvious tactical basis for *benefitting* the defendant's case will not be subject to further scrutiny." *Briones v. State*, 74 Haw. 442, 462–463, 848 P.2d 966, 976 (1993) (citations omitted; emphasis in the original).

We acknowledge that only two days had elapsed from the filing of the case 036 complaint to Defendant's change of his pleas, but we also observe that more than two weeks had passed since the commission of that offense, and presumably Inciong had at least that time period, and continuing access to Defendant at least, for purposes of information and investigation. At any rate, Defendant nowhere identifies nor explains what potentially meritorious defense additional time, discovery and investigation would have subserved. *Cf. State v. Reed*, 77 Hawai'i 72, 84, 881 P.2d 1218, 1230 (1994), *overruled on other grounds by State v. Balanza*, 93 Hawai'i 279, 1 P.3d 281 (2000) ("Reed's characterization of their potential testimony amounts to nothing more than speculation and, therefore, is insufficient to meet his burden of proving that his trial counsel's failure to subpoena the police officers as witnesses constituted constitutionally ineffective assistance of counsel" (citations omitted)).

All in all and in sum, we conclude that Defendant has failed to carry his burden to demonstrate "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *Reed*, 77 Hawai'i at 83, 881 P.2d at 1229 (citation and internal quotation marks omitted).

### B.

■ Even assuming, *arguendo*, that the circuit court's post-sentence statements to Defendant about "a conspiracy to distribute drugs" indicated its reliance on such in fashioning its sentence, we decide that in so relying, the circuit court did not abuse its "discretion in fitting the punishment to the crime[.]" *State v. Vellina*, 106 Hawai'i 441, 449, 106 P.3d 364, 372 (2005) (citation and internal quotation marks omitted).

This is not a case like *Vellina*, or *State v. Vinge*, 81 Hawai'i 309, 916 P.2d 1210 (1996), in which the supreme court held that the sentencing court abused its discretion in relying on unsubstantiated allegations of uncharged crimes in imposing consecutive sentences. *Vellina*, 106 Hawai'i at 450, 106 P.3d at 373 ("the circuit court unquestionably determined that Vellina had 'transferred' the semi-automatic firearm to a drug dealer and sentenced him with that in mind. . . . We see nothing in the record to support the circuit court's conclusion"); *Vinge*, 81 Hawai'i at 324, 916 P.2d at 1225 ("Vinge's supposed 'gang-related activity' clearly served as an aggravating factor in imposing his sentence").

■ Here, the presentence diagnosis and report set out details about the crimes that strongly suggested Defendant's involvement in large-scale drug distribution. To cap it off, Defendant's own letter to the circuit court described him as an "errand boy" in a drug dealing enterprise. *Cf. id.* at 323, 916 P.2d at 1224:

> In *United States v. Lemon*, 723 F.2d 922 (D.C.Cir.1983), the United States Court of Appeals for the District of Columbia outlined a three-part test to determine the sufficiency of "[gang] membership" evidence at sentencing. The court held that membership evidence may not be considered for purposes of imposing punishment unless the evidence is sufficient to establish that: (1) the defendant was a "member" of the group at issue; (2) the group's aims were illegal; and (3) the defendant intended to further those illegal aims. *Id.* at 940.

"[A] sentencing court may consider any and all *accurate* information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." *Vinge*, 81 Hawai'i at 323, 916 P.2d

**450**

at 1224 (emphasis added; original emphasis, citation and internal quotation marks omitted). The circuit court here did not do otherwise. Hence, it did not abuse its discretion in sentencing Defendant.

### III. Conclusion.

Accordingly, the three March 24, 2003 amended judgments that the circuit court entered in Cr. No. 02–1–0090(3) (No. 25776), Cr. No. 02–1–0498(3) (No. 25777) and Cr. No. 03–1–0036(3) (No. 25778), respectively, are affirmed.

